Deidra M. CHAVERS, Individually and as
Personal Representative of the Estate of James Chavers *v.*
GENERAL MOTORS CORPORATION; AlliedSignal, Inc.;
and Ford Motor Company

01-1410                                          79 S.W.3d 361

Supreme Court of Arkansas
Opinion delivered July 5, 2002

*Patton & Tidwell, L.L.P.*, by: *Nicholas H. Patton*; and *W. Mark Lanier, Kevin P. Parker*, and *Patrick N. Haines*, for appellant.

*Barber, McCaskill, Jones & Hale, P.A.*, by: *Robert L. Henry, III*, for appellee General Motors Corporation.

*Barber, McCaskill, Jones & Hale, P.A.*, by: *Michael E. Hale* and *Cynthia J. Worthing*, for appellee AlliedSignal, Inc.

*Wright, Lindsey & Jennings LLP*, by: *Edwin L. Lowther, Jr.*, and *Justin T. Allen*, for appellee Ford Motor Company.

DONALD L. CORBIN, Justice. This is an appeal of the Hempstead County Circuit Court's order granting summary judgment. Appellant Deidra M. Chavers filed a wrongful-death action, in both her individual capacity and as representative of the Estate of James Chavers, alleging that Appellees General Motors Corporation ("GM"), AlliedSignal, Inc., and Ford Motor Company, as manufacturers and distributors of asbestos-containing friction products, were responsible for the death of her husband James Chavers. On appeal, Appellant argues that the trial court erred in (1) granting Appellees' motions for summary judgment, and (2) applying the "frequency, regularity, and proximity" test to the issue of causation. This case was certified to us from the Arkansas Court of Appeals as involving an issue of first impression; hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(b)(1). We affirm.

Mr. Chavers was diagnosed with malignant mesothelioma, a rare form of cancer of the membrane lining the lungs, chest cavity, and abdominal cavity. According to the wrongful-death action filed by Mrs. Chavers, her husband contracted mesothelioma as a result of his exposure to various asbestos-containing products,

including brake products manufactured by each of the Appellees.[1] Specifically, GM was responsible for selling various brakes under the Delco name, while AlliedSignal sold brakes under the Bendix trade name.

Prior to his death, Mr. Chavers was deposed in connection with the pending litigation. According to his deposition testimony, one of Mr. Chavers's earliest known exposures to asbestos occurred while working for E. L. Bruce & Company, a furniture and hardwood flooring company, from 1960-1966. Mr. Chavers believed that the covering found on the overhead pipes in his work area contained asbestos. Mr. Chavers stated that he also worked for many years in the construction industry, performing both residential and commercial construction jobs. He estimated that sixty-five to seventy percent of his career was spent doing construction work. One task he often performed was putting up sheetrock. Mr. Chavers explained that this required him to apply a joint compound that contained asbestos in the seams of the sheetrock. This joint compound was delivered to the construction site dry and contained in a bag. Mr. Chavers was required to dump the bag into a five-gallon bucket and mix it with water. He then applied it to the sheetrock by rolling it on with a stick or trowel. Next, the compound had to be sanded, a process that he described as dusty.

Mr. Chavers also testified that he worked for Burks Wrecking, a demolition company, for two to three years. While employed by Burks, he worked on several large commercial projects in Little Rock, including the demolition of the old Greyhound Bus Station. Mr. Chavers testified that the bus station contained asbestos. He also described this job as one involving a lot of dirt and dust.

Mr. Chavers testified further that he was a "shade tree mechanic." In other words, he performed mechanical work on

---

[1] Originally, Appellant's wrongful-death action named numerous other defendants alleged to be engaged in the mining, processing, manufacturing, installation, maintenance, sale, and distribution of asbestos-containing products. On September 10, 2001, the trial court entered an order granting Appellant's motion to dismiss without prejudice her claims against each defendant, except for the three subject to this appeal.

his own automobiles, as well as on the automobiles of friends and family members. His work on cars mainly consisted of replacing brakes and transmissions. He started doing this type of work in 1955 or 1956. Mr. Chavers stated that he worked primarily on Fords, but also worked on Chevrolets and Chryslers. He usually worked on older vehicles and did not know whether the brakes he took off were original or replacement parts, but he assumed the brakes had previously been replaced. Mr. Chavers estimated that he changed about twelve to fifteen sets of brakes per year.

When he began performing brake jobs, he primarily worked on drum brakes. Mr. Chavers explained that replacing a set of drum brakes required him to blow dust out of the drum before putting new brakes on the car. Mr. Chavers also stated that he used several different brands of brakes, including Bendix, Wagner, Delco, and AC-Delco. He also recalled on one occasion removing a set of brakes stamped FOMOCO, which stands for Ford Motor Company. According to Mr. Chavers, Bendix was his favorite type of brakes to use and the type he used most often. He bought most of his brakes from Western Auto or Oklahoma Tire and Supply Company ("OTASCO"). Mr. Chavers stated that he continued to do brake jobs until 1999. The last time he replaced drum brakes, however, was in 1998.

Deidra Chavers was deposed on April 12, 2001. She had no knowledge of any specific product that her husband had contact with that contained asbestos. She did state that he told her once that he had heard that the dust at construction sites contained asbestos and that he often came home from his construction jobs dirty and dusty. She stated that her husband never worked as a full-time mechanic; rather, he just worked on cars in the front yard.

Dr. James Bruce, a forensic pathologist, was retained as an expert by Appellant in this case. He was deposed on April 25, 2001. He stated that his knowledge of Mr. Chavers's work history consisted of the fact that from 1961 through 1977, he was exposed to asbestos materials on various residential and commercial construction sites. Dr. Bruce further stated that these materials consisted of insulation, joint compound, and automotive friction

products. He admitted that he did not know what type of asbestos fibers are contained in any of those three materials, except that chrysotile fibers are generally found in automotive friction products. Dr. Bruce opined, however, that any type of asbestos fiber to which Mr. Chavers was exposed during the sixteen-year period could have contributed to his malignant mesothelioma.

He also stated that the most prevalent fibers found in individuals with no occupational exposure to asbestos was chrysotile, probably due to its prevalence in insulation materials in buildings. The following colloquy then took place between defense counsel and Bruce:

> Q. If chrysotile is, in your opinion, a contributing factor for mesothelioma, why is it that the general population who has no occupational exposure to asbestos does not have a higher incidence of mesothelioma when they in fact have been exposed to chrysotile?
>
> A. Well, *there must be some threshold level, whatever it is, that is generally required to produce changes.* We see and have reported people with some ferruginous bodies in their lungs but we have a normal range for that. *So the fact that some is there does not mean that there's enough to cause disease.*
>
> Q. So there is a dose relationship situation that exists here? You have to be exposed to enough of the stuff over some period of time to cause the disease?
>
> A. Yes.
>
> Q. You just don't happen to know what that threshold level is in this case?
>
> A. No, and *that's a point that's debated, what is the threshold, and I don't think that's really been determined.* [Emphasis added.]

Bruce also stated that at trial he would testify that all exposures to asbestos, given appropriate latency periods, would be significant factors in Mr. Chavers's mesothelioma. He further stated, "Each exposure would have the *potential* to cause disease." (Emphasis added.) Dr. Bruce typified Mr. Chavers's exposure through working with friction products as an occupational exposure. The difference between background-level exposures and occupational exposure would be the intensity and duration of the

exposure, according to Dr. Bruce. However, he was unable to state the amount of asbestos that Mr. Chavers was exposed to.

Later in his deposition, the following colloquy took place between defense counsel Skip Henry and Dr. Bruce:

Q. You don't have any independent knowledge of your own about what type product or products Mr. Chavers was exposed to that contained asbestos, do you?

A. No, I don't.

Q. You basically render your opinion based upon whatever information you're given on a background sheet by Mr. Campbell's office, correct?

A. That's right.

Dr. Bruce admitted that he had no knowledge of Mr. Chavers's medical information regarding the percent of asbestos in his lung tissue. According to Dr. Bruce, though, even a short, relatively intense exposure may be enough to cause mesothelioma. When asked what he meant by a relatively intense exposure, Dr. Bruce stated that it was a short period of time performing an occupation that would generate a significant amount of fibers. He further explained that such an exposure probably would occur working around commercial construction. He stated that in the 750 cases that he had reviewed, he had made no diagnosis of mesothelioma in a person whose only occupation was that of automobile mechanic.

While being questioned by defense counsel William Harrison, Dr. Bruce gave the following information:

Q. . . . In a situation where you have multiple exposures, in order for you to say that an exposure was significant in the sense that that exposure was significant enough to contribute to the causation of meso, what is the criteria that you want to see for that specific exposure?

A. Either known amounts of fibers that the occupation or job produced, or be able to relate that occupation to others that have been measured to show that there's a significant asbestos burden in the breathable air.

Finally, Dr. Bruce stated that he had all the information and materials that he needed to testify at trial.

GM was the first Appellee to file a motion for summary judgment on May 11, 2001, alleging that there were no genuine issues of material fact. Specifically, GM averred that Appellant had failed to establish product identification of a GM product to which Mr. Chavers was exposed and also failed to establish that GM's product proximately caused the claimed damages.

On May 15, 2001, AlliedSignal filed a motion for summary judgment alleging a failure to establish product identification. The company also alleged that Appellant failed to present evidence establishing that Mr. Chavers was exposed to an AlliedSignal asbestos-containing product with sufficient frequency, regularity, and proximity, thereby failing to establish the element of proximate causation.

Also on May 15, Ford filed a motion for summary judgment. Therein, Ford alleged that the evidence could only document one exposure of Mr. Chavers to a Ford product, and that as a matter of Arkansas law, one exposure was insufficient credible evidence from which a trier of fact could infer that a Ford product was a substantial factor in causing Mr. Chavers's illness.

The trial court held a hearing on the motions for summary judgment on June 1, 2001. A written order was subsequently entered on June 25, 2001, granting each Appellees' motion. Therein, the court made the following findings:

1. There is no genuine issue of material fact with respect to plaintiff's claims against these defendants, and based on the undisputed material facts, AlliedSignal, Inc., Ford Motor Company, and General Motors Corporation are entitled to entry of judgment as a matter of law.

2. With regard to plaintiff's claims against General Motors and AlliedSignal, plaintiff has not or cannot produce sufficient product identification of the Delco (General Motors) or Bendix (AlliedSignal) brake shoes or whether these brake shoes contained asbestos. Plaintiff has also failed to produce evidence that plaintiff's decedent was exposed to asbestos from Delco or Bendix brake shoes. Finally, even if there had been proof that plaintiff's decedent was exposed to Delco or Bendix brake shoes, plaintiff has failed to produce any evidence that this exposure was a proximate cause of the decedent's mesothelioma.

3. With regard to plaintiff's claims against Ford Motor Company, plaintiff did offer evidence that on one occasion plaintiff's decedent removed a FOMOCO brake shoe from a vehicle. The court finds, however, that this is insufficient product identification to establish that this exposure was a proximate cause of decedent's mesothelioma.

4. The court further finds that even if plaintiff had produced evidence of sufficient product identification, plaintiff has not satisfied the "frequency, regularity and proximity test" which this court finds would be followed by the Arkansas Supreme Court.

Appellant originally lodged this appeal with the court of appeals, but it was certified to this court as a matter involving an issue of first impression. On appeal, Appellant raises the following arguments: (1) It was error to grant summary judgment on the basis of insufficient evidence that Mr. Chavers was exposed to GM and AlliedSignal brake products; (2) there was evidence that Mr. Chavers was exposed to asbestos from GM and AlliedSignal brake products; (3) there was evidence that this exposure was a proximate cause of Mr. Chavers's injuries; (4) this court should not adopt the "frequency, regularity, and proximity" test to mesothelioma cases, or if so, it should be relaxed; and (5) this test should not be used in cases involving direct, rather than circumstantial, evidence.

We note at the outset that summary judgment is no longer viewed by this court as a drastic remedy; rather, it is viewed simply as one of the tools in a trial court's efficiency arsenal. *Foreman Sch. Dist. No. 25 v. Steele*, 347 Ark. 193, 61 S.W.3d 801 (2001). As we have often stated, summary judgment is to be granted by a trial court if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Ark. R. Civ. P. 56; *Pfeifer v. City of Little Rock*, 346 Ark. 449, 57 S.W.3d 714 (2001); *Mashburn v. Meeker Sharkey Fin. Group, Inc.*, 339 Ark. 411, 5 S.W.3d 469 (1999). The purpose of summary judgment is not to try the issues, but to determine whether there are any issues to be tried. *Elam v. First Unum Life Ins. Co.*, 346

Ark. 291, 57 S.W.3d 165 (2001); *Flentje v. First Nat'l Bank of Wynne*, 340 Ark. 563, 11 S.W.3d 531 (2000).

We have repeatedly held that summary judgment is to be granted by a trial court only when it is clear that there are no genuine issues of material fact to be litigated and the moving party is entitled to judgment as a matter of law. *Fryar v. Roberts*, 346 Ark. 432, 57 S.W.3d 727 (2001); *Stilley v. James*, 345 Ark. 362, 48 S.W.3d 521 (2001). Once a moving party has established a *prima facie* entitlement to summary judgment, the opposing party must meet proof with proof and demonstrate the existence of a material issue of fact. *Id.* On appeal, we determine if summary judgment was appropriate based on whether the evidentiary items presented by the moving party in support of its motion leave a material fact unanswered. *Id.* This court views the evidence in a light most favorable to the party against whom the motion was filed, resolving all doubts and inferences against the moving party. *Id.* Our review is not limited to the pleadings, as we also focus on the affidavits and other documents filed by the parties. *Id.*

We first consider Appellant's argument regarding the appropriate standard to be followed in determining if there is proof of causation in the present matter. Appellant argues that it was error for the trial court to apply the "frequency, regularity, and proximity" test to this case. This test represents another approach to the causation analysis that has been adopted by a majority of courts in dealing with asbestos cases. Appellant claims it was error to apply this test here for two reasons: (1) It is inappropriate because the medical evidence shows that even a minimal exposure to asbestos can cause mesothelioma; and (2) it should only be applied in cases involving circumstantial, rather than direct, evidence. We disagree.

This test has its origins in *Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156 (4th Cir. 1986). There, the appellants appealed a district court's grant of directed verdicts in favor of the manufacturers of asbestos-containing products. The appellants requested that the court adopt a rule that would find a jury question had been established as to whether that product contributed to the plaintiff's disease where the plaintiffs present any evidence

that a company's asbestos–containing product was at the workplace while the plaintiff was at the workplace. In declining to adopt such a broad standard, the Fourth Circuit noted that such a standard would be contrary to Maryland's law on substantial causation. Instead, the court adopted the district court's enunciated standard: "Whether a plaintiff could successfully get to the jury or defeat a motion for summary judgment under such a theory would depend upon the frequency of the use of the product and the regularity or extent of the plaintiff's employment in proximity thereto." *Id.* at 1162. The *Lohrmann* court further noted that such a rule was in effect a *de minimis* rule in that a plaintiff is required to prove more than a casual or minimal contact with the product.

In *Jackson v. Anchor Packing Co.*, 994 F.2d 1295 (8th Cir. 1993), the Eighth Circuit Court of Appeals, in reviewing a grant of summary judgment, affirmed the district court and held that if the issue was presented to us, the Arkansas Supreme Court would adopt the "frequency, regularity, and proximity" test in determining whether proximate cause had been proven in toxic-tort cases. In adopting this test, the Eighth Circuit rejected the plaintiffs' contention that Arkansas courts would allow a lower standard of proof in situations involving asbestos-exposure cases. *Id.* The court likewise rejected the plaintiffs' contention that the Arkansas courts had adopted the theory of alternative liability in concurrent-cause cases. The court found unpersuasive the plaintiffs' reliance on this court's opinion in *Woodward v. Blythe*, 249 Ark. 793, 462 S.W.2d 205 (1971). The *Jackson* court determined that this court's opinion in *Woodward* did not alter traditional notions of causation, nor did it adopt a lower standard of alternative liability.

After rejecting the appellants' alternative arguments regarding the appropriate standards, the Eighth Circuit concluded that under Arkansas law, asbestos plaintiffs in Arkansas must introduce sufficient evidence to allow a jury to find that more likely than not their exposure to a particular defendant's product was a substantial factor in producing their injuries. *Id.* at 1303. The court went on to state:

> Consequently, to survive a motion for summary judgment under Arkansas law, an asbestos plaintiff must show that the defendant's asbestos products were used with sufficient frequency and regu-

larity in locations from which asbestos fibers could have traveled to the plaintiff's work areas that it is probable that the exposure to the defendant's asbestos products caused the plaintiff's injuries.

*Id.* at 1303. In affirming the summary judgment, the Eighth Circuit noted that the plaintiffs' expert witness did not visit the plant where the alleged asbestos exposure took place to determine airflow patterns and the extent to which asbestos fibers could have been disseminated. Thus, the court determined that this expert's affidavit regarding the asbestos exposure was conclusory and did not provide a basis for denying summary judgment.

The Eighth Circuit again applied this "frequency, regularity, and proximity" test to an asbestos case in *Chism v. W.R. Grace & Co.*, 158 F.3d 988 (8th Cir. 1998). There, the appellants, survivors of a man who died from malignant mesothelioma, sued the manufacturers of asbestos-containing products, alleging that the decedent's inhalation of asbestos from those products caused his injuries. Noting that the Eighth Circuit, as well as a majority of other courts, had adopted the *Lohrmann* test in establishing causation, the court stated that the test has four parts: (1) exposure to a particular product; (2) on a regular basis; (3) over an extended period of time; and (4) in proximity to where the plaintiff actually worked. The court then concluded that the appellants had failed to establish causation, because while they showed that the decedent was exposed to Zonolite vermiculite on a regular basis, they failed to establish that that product contained any asbestos that could have caused the asbestos-related form of cancer that caused the decedent's death. Finally, the court noted that the appellants had had ample time and opportunity to develop supporting expert testimony in an effort to avoid summary judgment.

Similarly, in *Wright v. Willamette Industries, Inc.*, 91 F.3d 1105 (8th Cir. 1996), the court reversed a circuit court's judgment in favor of the plaintiffs, holding that they failed to produce evidence that they were exposed to hazardous levels of formaldehyde from fibers that drifted from the defendant's plant. As the court pointed out, the plaintiffs had the burden of proving proximate cause in order to recover under their negligence claim. The court agreed with the defendant that the plaintiffs were required to demonstrate actual exposure to a toxic substance emitted from the

defendant's plant at levels that are known to cause injuries like the ones complained of by the plaintiffs. The court reasoned that it is not enough for a plaintiff to show that a certain chemical agent sometimes causes the kind of harm complained of. "At a minimum, we think there must be evidence from which the factfinder can conclude that the plaintiff was exposed to levels of that agent that are known to cause the kind of harm that the plaintiff claims to have suffered." *Id.* at 1107 (citing *Abuan v. General Elec. Co.*, 3 F.3d 329, 333 (9th Cir. 1993)). The court agreed that the appellees had proved that they were exposed to the wood fibers, but they failed to produce evidence that they were exposed to a hazardous level of formaldehyde. The court further noted that the district court should have stricken the testimony of appellees'· expert witness, Dr. Frank Peretti, because his opinion that the appellees' complaints were more probably than not related to formaldehyde exposure was not based on any scientific knowledge and, thus, was nothing more than mere speculation. Finally, the court concluded that the appellees' failure to prove exposure at hazardous levels left them unable to carry their burden of proof on the issue of causation.

We conclude that the "frequency, regularity, and proximity" test is the correct test to apply in this case, and we adopt it. Under this test, to survive a motion for summary judgment, Appellant was required to prove the following elements: (1) Mr. Chavers was exposed to a particular asbestos-containing product made by Appellees, (2) with sufficient frequency and regularity, (3) in proximity to where he actually worked, (4) such that it is probable that the exposure to Appellees' products caused Mr. Chavers's injuries. *See Jackson*, 994 F.2d 1295.

Regarding Appellees GM and AlliedSignal, Appellant's proof fails on the first element, as she has failed to show that it was their asbestos-containing products that were used by Mr. Chavers. Mr. Chavers testified during his deposition that between 1955 and 1999, he changed the brakes on his cars and the cars of his friends and family on an average of twelve times per year. He stated that most of the brake jobs that he did involved drum brakes. He explained that in changing a drum brake, he would have to blow out all the dust on the wheel that came from the old brakes. He

stated that it was a dusty process. He stated that most of the vehicles he did brake jobs on were older vehicles, and that he did not know whether the brake shoes that he was removing were original equipment. Only one time, during the course of those forty-odd years, did Mr. Chavers ever recall seeing anything that would indicate the manufacturer of the brake shoe that he was replacing. That one time, he recalled that the brake had "FOMOCO" on it, which identified it as a brake sold by Ford.

Appellees admitted below that some of the brake products they sold during the years that Mr. Chavers was a "shade tree mechanic" did contain asbestos. Regarding GM's products, Mr. Chavers identified an AC–Delco brake box and stated that the box looked like the Delco brake boxes that he had purchased. He did not, however, identify any AC–Delco brake parts. Nor did he identify the particular makes and models of the automobiles on which he worked. In its answer to interrogatories, GM offered proof that although some of the brake products it sold did contain asbestos, it also produced replacement brake parts that did *not* contain asbestos, which were to be used when the original brake products did not contain asbestos.

■ Regarding brake products made by AlliedSignal, Mr. Chavers identified a box of Bendix-brand brakes. The box he identified were disc brakes, and Mr. Chavers stated that he mostly used brake shoes. AlliedSignal's answer to interrogatories stated that it manufactured or sold the following asbestos-containing brake products under the Bendix name: brake linings, disc brake pads, brake blocks, and clutch facings. Brake shoes were not listed. The foregoing proof is insufficient to establish a jury question on the issue of product identification. There was no evidence regarding the specific GM or AlliedSignal products used by Mr. Chavers or that the particular products he used contained asbestos.

■ ■ As for Appellee Ford, Appellant's case fails on the elements of frequency and regularity. The test requires that Appellant show not only that Mr. Chavers used the Appellee's asbestos-containing products, but also that the use was sufficiently frequent and regular, such that it was probable that Mr. Chavers's exposure to the asbestos-containing product caused his illness. As

indicated above, the only evidence that Mr. Chavers was exposed to a specific asbestos-containing product is the one time that he recalled removing a set of Ford brakes. Such a one-time exposure does not satisfy that part of the test requiring regularity and frequency. Moreover, even if we were to adopt the "relaxed" test advocated by Appellant, as discussed in *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir. 1992), the proof would still fail. The competent medical evidence presented in this case does not support the conclusion that a one-time exposure to asbestos-containing brakes was a substantial cause of Mr. Chavers's mesothelioma. *Id.* Accordingly, because Appellant's proof falls short of the elements required under the "frequency, regularity, and proximity" test, summary judgment was appropriate.

Affirmed.